**Perfecto Robledo RAMOS, Plaintiff,**

v.

**SECRETARY OF HEALTH AND HUMAN SERVICES, Defendant.**

Civ. No. 80–0505.

United States District Court, D. Puerto Rico.

Feb. 25, 1981.

Rafael A. Oliveras Vera, Hato Rey, P. R., for plaintiff.

U. S. Atty., Hato Rey, P. R., for defendant.

## OPINION AND ORDER

PESQUERA, Chief Judge.

This is an action brought by plaintiff pursuant to Section 205(g) of the Social Security Act (hereinafter referred to as the Act), as amended, 42 U.S.C. § 405(g), to obtain judicial review of the denial by the defendant, the Secretary of Health and Human Services (hereinafter referred to as the Secretary), of his claim for a period of disability and disability insurance benefits.

The scope of judicial review comprised by Section 205(g) of the Act provides that the findings of the Secretary as to any fact, if supported by substantial evidence, shall be conclusive. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971); *Gonzalez v. Richardson*, 455 F.2d 953 (1st Cir., 1972) It is the Secretary's duty to consider the conflicting evidence on record and then proceed to make his own findings of fact. *Alvarado v. Weinberger*, 511 F.2d 1046 (1st Cir., 1975) The district court is not to make additional findings of fact to supplement those made by the Secretary. *Richardson v. Perales, supra*; *Torres v. Secretary of HEW*, 475 F.2d 466 (1st Cir., 1973) In social security disability cases, it is for the Secretary to determine what weight should be given to particular items of evidence. *Miranda v. Secretary of HEW*, 514 F.2d 996 (1st Cir., 1975)

Plaintiff is a 59 year old man with high school education and training as a machinist, occupation which he has performed along with jobs as a truck driver, grill man, handyman and self-employed pizza shop owner. He filed for disability benefits on October 4, 1978 (Tr. 92–95) alleging hypertension, coronary insufficiency, varicose veins and a severe emotional disturbance. He met the earning requirements of the Act on September 1, 1978, the alleged onset date of disability, and continued to meet them at least up to the date of the Secretary's final denial of benefits, December 31, 1979.

The following is a summary of the evidence on record:

In August and early September, 1978, plaintiff underwent a routine physical examination given by the Water Resources Authority, then plaintiff's employer. An electrocardiogram (EKG) performed as part of this examination disclosed changes consistent with coronary insufficiency. (Tr. 187) Plaintiff was pronounced "totally and permanently disabled for working purposes" by the Water Resources Authority's physician. Later, in September 1978, plaintiff was examined at the Veterans Administration complaining of a heart condition, depression and insomnia. Plaintiff had no complaints of chest pain (Tr. 166), and an electrocardiogram was again performed. This was interpreted as revealing lateral ischemic changes, but no ST segment changes. (Tr. 163) Plaintiff was found to be obese and given instructions for a low sodium, weight reducing diet; he was also prescribed a diuretic. (Tr. 164) The Veterans Administration made a final diagnosis of depressive insomnia. (Tr. 168)

Dr. César Negrette, an internist, examined plaintiff on November 1, 1978. (Tr. 169) Dr. Negrette's report indicates that plaintiff came to him because of the Water Authority's finding of an abnormal EKG. He had no complaints of precordial chest pain, dyspnea palpitations or chest oppression. A physical examination revealed an obese male, in no distress and in good mental state. His chest was symmetric and his lungs showed normal breathing sounds; heart tones were of good quality. There were no thrills, murmurs or rubs. There was no venuous engorgement. An electrocardiogram revealed lateral ischemic changes. A chest x-ray performed by Dr. Gerant Rivera, a radiologist, revealed normal cardiothoracic ratio, normal pulmonary vasculature and clear lung fields. (Tr. 173) Dr. Negrette's diagnosis was probable arteriosclerotic disease, Functional Class I, and obesity. Dr. Negrette's residual functional capacity report indicates that plaintiff can sit, stand and walk eight hours a day, lift and carry up to 20 pounds, continuously, and up to 100 pounds occasionally, and that he could bend, squat, crawl and climb frequently. No restrictions of activities was noted. (Tr. 174)

Between November 1978 and April 1979, plaintiff was seen monthly by physicians from the State Insurance Fund. A report on an examination held on November 2, 1978 indicates that plaintiff complained of mild precordial discomfort experienced only at rest and lasting only a few seconds. Plaintiff denied feeling palpitations or dizziness. The diagnostic impression was labile hypertension and exogenous obesity. (Tr. 178) An x-ray report revealed no evidence of pleuropulmonary pathology. A report of December 4, 1978 reveals that plaintiff was complaining of postural dizziness and loss of balance for about six months, and intermittent headaches, one to two times a week, relieved by analgesics (aspirin). His blood pressure was 140/90; laboratory tests were within normal limits, a chest x-ray was normal, and an EKG showed non-specific T wave changes. (Tr. 177, 248) Records from an examination held ten days later reveal that plaintiff was continuing to experience transient dizziness and headaches. He also reported palpitations, nervousness and insomnia. This time he reported that the dizziness had been present one year. Again he denied chest pain. The report indicates no evidence of angina or heart failure. A treadmill stress test and a neurological exam were ordered. (Tr. 208, 244)

On January 15, 1979 plaintiff was given a neurological examination. He complained of frequent headaches and dizziness. The neurological evaluation revealed no specific abnormalities. The diagnosis was vascular headaches E.U. (Migraine type) not related. (Tr. 243) An EKG done on January 18, 1979 was reported as normal. (Tr. 243)

An Exercise EKG Report Sheet, filled out by the Veterans Administration Hospital on February 22, 1979 reveals no EKG change. The blood pressure response was from 120/80 to 170/90. The report indicates that patient's symptoms during the test were "none except fainting sensation and unsteady gait". There were no auscultatory changes. The report indicates very poor patient motivation. (Tr. 215)

On April 24, 1979 plaintiff was again examined by the State Insurance Fund. Plaintiff had the same complaints of headaches and dizzy spells as previously noted. Again there were no chest pains or respiratory distress. The final diagnosis indicated on the report was orthostatic hypotension, not related and vascular headaches, not related. Plaintiff was discharged from the Internal Medicine Clinic and prescribed Acetaminophen (extra strength) and Dalmane—15 mgm. (Tr. 241)

In June 1979 plaintiff was evaluated by physicians from the Department of Social Services. Dr. Arrillaga Torrens, an internist, indicated that plaintiff was obese and looked drowsy. His blood pressure was 110/70, his pulse regular and an electrocardiogram showed low T's in L1, L3 but otherwise normal. Dr. Arrillaga reported that the plaintiff had a psychoneurotic problem, perhaps caused by too many drugs (Tr. 219), and stated he should be examined by a psychiatrist. The General Basic Medical Examination Record of the Department of Social Services, Vocational Rehabilitation Program, indicates that plaintiff was in apparent good health and a recommendation was made that plaintiff be tested to determine present capacity and be helped to find a trade or skill which would avoid heavy physical exertion. (Tr. 220–221)

Dr. Meléndez Poventud, an internist, examined plaintiff on September 6, 1979. His report indicates that plaintiff complained of precordial stabbing pains but that these pains were not associated with any cardiovascular symptoms. A physical examination revealed no abnormalities. Dr. Meléndez, however, observed that plaintiff kept breathing deeply in a hysteric mood all throughout the evaluation. A chest x-ray performed by Dr. Méndez Bryan, a radiologist, was negative. (Tr. 233) Dr. Meléndez' impressions were of mild hypertension, controlled; grade 1 hypertensive retinopathy, moderate varicose veins, and an emotional disturbance. He found no organic heart disease. (Tr. 231–232) Dr. Meléndez filled out a Residual Functional Capacity Report indicating that plaintiff could work 4 to 6 hours a day and could lift and carry up to 20 pounds frequently and 100 pounds occasionally, and that plaintiff could bend, squat, crawl, and climb frequently. He noted moderate restrictions of activities involving occupational hazards.

The decision of the administrative law judge, which eventually became the final one of the Secretary, was made pursuant to the recently adopted regulations of the Social Security Administration appearing in 20 CFR Subpart P, 404.1501 et seq. On February 29, 1979 said amended regulations became effective in claims for disability insurance benefits under the Act. These amendments expand previous regulations to include additional criteria for the evaluation of disability cases like the one at bar. They were intended to consolidate and elaborate upon long standing medical-vocational evaluation policies for adjudicating disability claims in which an individual's age, education and work experience must be considered in addition to his medical condition. The intention behind these amendments was to insure consistency in the handling of cases of similarly situated individuals. These rules make possible that determinations made by one set of adjudicators on the basis of the same facts will be handled the same way by another group of adjudicators, wherever in the country they may be located. See, generally, McCormick, *Social Security Claims and Procedure*, 2 Ed., Sec. 679.

The recent case of *Phillips v. Harris*, 488 F.Supp. 1161 (W.D.Va.1980) contains an adequate summary of the procedure established by the new regulations:

"Stated briefly, the new regulations establish a 'sequential evaluation' for the adjudication of disability claims. 20 C.F.R. 404.1503. The first inquiry under the sequence concerns whether a claimant is currently engaged in substantial gainful employment. If it is found that he is, the claim is denied without reference to the other steps in the sequence. If he is not, the second inquiry is whether the claimant has a 'severe' impairment. If he does not, the claim is denied. If a severe

impairment is present, the third inquiry is whether such impairment meets or equals one of the impairments listed under Appendix I to Subpart P of the Administrative Regulations No. 4. If it does, the claim is approved. If it does not, the fourth inquiry is whether the claimant's impairments prevent him from performing his past relevant work. If he is found to be capable of returning to his past relevant work, the claim is denied. If he is not found to be so capable, the fifth and final inquiry is whether the claimant is able to perform other forms of substantial gainful activity, considering his age, education and prior work experience. If he is not, the claim is approved. Evaluation for purposes of the fifth step is made through reference to Appendix II to Subpart P of the Administrative Regulations No. 4, and to the text of the remaining new regulations, especially 20 C.F.R. 404.-1504–1513."

In the case at bar, the evaluation proceeded to the fifth and final step of the sequence. Upon consideration of the evidence, the administrative law judge made the following findings:

1. Age categories have been established as follows: (1) younger individual (under age 50); (2) individual approaching advanced age (age 50–54); (3) individual of advanced age (age 55 or over); (4) individual closely approaching retirement age (age 60–64). 20 CFR 404.1506

2. Educational categories have been established as follows: (1) illiteracy (inability to read or write); (2) marginal education (sixth grade or less); (3) limited education (grades 7 through 11); (4) high school education and above; and (5) inability to communicate in English. Lack of formal schooling is not necessarily proof that an individual is uneducated. Past work responsibilities and other evidence (e.g., daily activities, hobbies, or the results of testing) may demonstrate that the individual has a higher educational level than his formal schooling would indicate. An individual with a marginal education is considered to have sufficient competence in reasoning, arithmetic, and language skills to perform simple, unskilled jobs. An individual with a limited education is considered to have sufficient competence to perform unskilled work and some semi-skilled or skilled jobs. An individual with a high school education or above is considered to have sufficient competence to perform both semi-skilled and skilled work. An inability to communicate

Plaintiff was found to be of "advanced age" as defined by 20 CFR 404.1506(d)[1] and to have a "high school and above" education under 20 CFR 404.1507(e).[2] The administrative law judge further found plaintiff to be a "skilled worker" with skills transferable to other jobs, according to 20 CFR 404.1511(d)[3], and to possess a maximum sustained work capacity to perform light work. (Tr. 46–47)[4]

Under the criteria established in Table No. 2 of 20 CFR Subpart P, App. 2, plaintiff's scheme of medical-vocational factors corresponds to a finding of nondisability.

The Court has found the Secretary's findings as to age, education and residual functional capacity to be supported by substantial evidence. On the element of age, plaintiff testified he was born on 1921, and was 58–59 years old. (Tr. 61) Said age is defined as "advanced" by the regulations. See 20 CFR 404.1506(d). Regarding the educational factor, 20 CFR 404.1507(e) defines "high school education and above" as having competence in reasoning, arithmetic and language skills acquired through formal schooling at a level of grade twelve

in English ordinarily is considered to be a vocational handicap. See 20 CFR 404.1507.

3. Work experience categories have been established as follows: (1) unskilled work; (2) semi-skilled work; (3) skilled work; and (4) transferable work skills. Unskilled work requires little or no judgment in the performance of simple duties that can be learned on the job in a short period of time; no acquired work skills are attributed to persons who have performed only unskilled work. Semi-skilled work involves skills such as alertness, inspecting, testing, and tending or guarding things or persons; coordination and dexterity in the use of hands or feet for rapid performance of repetitive tasks also may be classified as semi-skilled. Skilled work involves the exercise of independent judgment in the performance of work or in dealing with personnel, data, or abstract ideas at a high level of competency. Transferable work skills are those skills which can be utilized to meet the requirements of other jobs or kinds of work. 20 CFR 404.1508.

4. Work categories have also been established according to exertional requirements. See 20 CFR 404.1510.

or above. Plaintiff, who was classified under said standard, testified he went through four years of high school and had further training as a machinist. Moreover, his prior job as the owner of a pizza shop is demonstrative of at least some capability in the aforementioned aspects of the classification.

On the aspect of residual functional capacity, the administrative law judge found plaintiff able to perform at least light work. For said conclusion, the regulations require a finding that plaintiff can lift a maximum of 20 pounds and can frequently lift or carry objects weighing up to 10 pounds. Also, the claimant must be able to perform jobs requiring a significant degree of walking, standing or sitting; with capacity for some degree of pushing and pulling of arm or leg controls. See 20 CFR 404.1510(c). There is evidence on record showing that plaintiff can perform all the mentioned activities and even more. Dr. Negrette's report of November 1, 1978 shows plaintiff to be able to sit, stand and walk for 8 hours; to lift and carry up to 20 pounds frequently and up to 100 pounds occasionally. No restriction was noted in feet and hands for performing repetitive movements. (Tr. 174)

Dr. Meléndez Poventud, in a report dated September 6, 1979 found plaintiff to be able to sit for up to 6 hours. Standing and walking were limited to 4 hours. He could lift up to 20 pounds frequently and up to 100 pounds occasionally. Again, no restriction on hand or feet movements for operating controls was noted. (Tr. 235) In short, all the evidence mentioned is consistent with and supportive of the administrative law judge's finding that plaintiff could not return to his former heavy jobs, but could engage in light or sedentary work.

Plaintiff's allegation of hypertension, varicose veins and coronary insufficiency clearly have no merit under our standard of review. There is certainly substantial evidence on the record to support the Secretary's findings that none of the mentioned conditions prevents plaintiff from engaging in substantial gainful activity. While the evidence is demonstrative of clear limitations on plaintiff to perform heavy jobs, various medical reports already mentioned by the Court are evincive of capacity to engage in at least light to sedentary work.

Plaintiff's mental condition also fails to present a disabling picture. While it is true that one physician recommended a psychiatric evaluation and there is no evidence of such an exam on the record, there is evidence which shows the administrative law judge's decision to be a reasonable one. At the hearing plaintiff testified as follows to questions posed by his own counsel:

"Rep.—But you didn't answer the question. Are they treating you for your nervous condition?

Clmt.—The—mostly my nerves—mostly they don't hurt me. Once ... every once in a while I get nervous. I have those pills to _____, and these pills they ordered _____." (Tr. 84)

No more questions were asked by plaintiff's counsel on the subject. Plaintiff's testimony during the hearing reflected no incoherent expressions or any other manifestation of emotional discomfort. Also, a report from the State Insurance Fund dated January 15, 1979, stated that claimant was found to be alert, oriented in all three spheres, with adequate judgment and calculation. No agnosia, apraxia or aphasia was noted. His motor and sensory systems were found to be intact. (Tr. 243)

Although there is evidence on record conflictive with that mentioned above, such conflict was solved by the Secretary, as trier of facts, and we are not to alter his findings or substitute them by our own. *Alvarado v. Weinberger, supra.*

Plaintiff's principal argument on review, however, regards the administrative law judge's determination that he had skills transferable to other jobs in the national economy. We are urged to consider the question of whether the Secretary's burden of proving the existence of alternative jobs in the national economy which plaintiff could perform is satisfied by merely making reference to the recently adopted regulatory guidelines. Plaintiff avers that these guidelines permit unsubstantiated lay de-

terminations as to transferability of work skills and the availability of jobs in the national economy.

Our research has netted little case law interpretative of the new regulations. The case of *Phillips v. Harris, supra,* is the most illustrating of the few. There, the Court upheld the promulgation of the regulations in question as constituting a valid exercise of the Secretary's statutory responsibility under 42 U.S.C. § 405(a) and further concluded that said regulations did not deprive a claimant of his constitutionally protected right to due process. *Phillips v. Harris, supra,* at p. 1165.

The Court in *Phillips,* however, specifically stated that the manner in which said regulations are applied may sometimes preclude a finding of substantial evidence, and cautioned against the tendency of some administrative law judges to disregard the specific facts of each individual case while overemphasizing the mechanical formulations contained in Appendix II of Subpart P.

It further went on to consider general question of how to deal with cases in which a prima facie case of disability (inability to perform prior jobs) is established in light of the new regulations. Essentially, the Court concluded that said regulations do not alter, in any way whatsoever, the burden which rests upon the Secretary to come forward with evidence that plaintiff has the capacity to perform specific jobs that exist in the national economy. The administrative law judge must bear in mind such duty and is to apply the regulations in a manner consistent with the case law which has defined the correct way of discharging such a burden.

It is well settled that once a claimant has shown his inability to perform previous work, then the Secretary has the burden of showing that the claimant can engage in other forms of substantial gainful activity considering his age, education and work experience. *Pelletier v. Secretary of HEW,* 525 F.2d 158 (1st Cir., 1975); *Hernández v. Weinberger,* 493 F.2d 1120 (1st Cir., 1974); *Hall v. Secretary of HEW,* 602 F.2d 1372, 1375 (9th Cir., 1979). In order for the Sec-

retary to satisfy the requirements of such burden, he must produce "evidence on the skills of the particular claimant and the availability of work which matches those skills"; *Hernández v. Weinberger, supra.*

■ The usual procedure used to accomplish said task was by having a vocational expert provide the necessary evidence to link a claimant's residual skills with the requirements of various jobs in the national economy. When no vocational expert was used, courts were inclined to approve the administrative law judge's conclusions only if the same were deemed to be within the common knowledge and experience of ordinary men; *McLamore v. Weinberger,* 538 F.2d 572 (4th Cir., 1976); *Hernández v. Weinberger, supra; Phillips v. Harris, supra.* Nevertheless, the preferable method for the government to use in meeting its burden has been testimony by a vocational expert. See *O'Banner v. Secretary of HEW,* 587 F.2d 321 (6th Cir., 1978); *Hall v. Secretary of HEW, supra; Smith v. Califano,* 592 F.2d 1235 (4th Cir., 1979).

■ No *per se* rule exists that a vocational expert's testimony is necessary. Where one is not used, however, reviewing courts will require explicit and detailed findings in support of the administrative law judge's conclusions in order to determine if the same are supported by substantial evidence. Such determination will then depend on the complexity of the vocational questions presented versus the administrative law judge's capacity to deal with them.

■ If the vocational picture is not a complex one, and the matching of skills with the jobs mentioned by the administrative law judge is fairly obvious, the courts will usually affirm the administrative law judge's conclusion even without a vocational expert's testimony. See *McLamore v. Weinberger, supra; O'Banner v. Secretary of HEW, supra.* If, on the other hand, the decision is a close one, the courts will generally require vocational expert testimony. See *Phillips v. Harris, supra.* Sometimes, cases are reversed or remanded for clarification when the courts are faced with plain

conclusions unaccompanied by specific findings. See *Small v. Califano*, 565 F.2d 797 (1st Cir., 1977).

■ In short, the test is one to be made on a case-by-case basis, with the result depending on whether the administrative law judge's treatment of vocational questions is a reasonable one. The use or not of a vocational expert will add or detract from the reasonableness of a decision depending on whether the questions involved are either complex or obvious.

In the case at bar, the administrative law judge made a decision that plaintiff had skills transferable to other jobs in the national economy such as webber, joiner or tacker. (Tr. 45, 46) Plaintiff contends such a decision was made through a perfunctory reference to the new regulations and without procuring testimony by a vocational expert. The Secretary retorts that the new regulations provide detailed descriptions of the exertional requirements of work in the national economy which make it possible for an administrative law judge to make factual findings regarding the exertional requirements of various jobs without adducing testimony by a vocational expert.

■ The Court agrees that the regulations are an adequate guideline to make the determination as to the various elements of a disability claim. We have already found substantial evidence to support some of those findings, i. e., age, education and residual functional capacity. As to them, there is evidence on record and the same is discussed by the administrative law judge before arriving at his decision.[5] The Court was thus put in a position to evaluate the findings made.

The same cannot be said for the finding of transferability of skills. Although afforded an outline in 20 CFR 404.1511(e), the administrative law judge failed to make explicit findings corresponding to the evidence in the record, to support his transferability conclusion. The aforementioned section reads as follows:

"(e) Transferable work skills. An individual is considered to have transferable skills when the skilled or semi-skilled work functions which he or she has demonstrated in his or her past work can be applied to meet the requirements of skilled or semi-skilled work functions of other jobs or kinds of work. Transferability depends largely on the similarity of occupationally significant work functions among jobs. Transferability is most probable and meaningful among jobs in which the same or a lesser degree of skill is required; and the same or similar tools and machines are used; and the same are (sic) similar raw materials, products, processes, or services are involved. There are degrees of transferability ranging from a close approximation of work functions involving all three factors to only remote and incidental similarities among jobs. A complete similarity of all three factors is not necessary to warrant the inference of transferability. Where an individual's work skills are so specialized or have been acquired in such a limited vocational setting that they are not readily usable in other industries, jobs and work environments, they are not transferable and the individual may be considered as if he or she is unskilled."

The administrative law judge, however, limited his discussion of this item to the following words:

"He has skills transferable to other jobs . . . The claimant has work skills demonstrated in his past work which can be applied to other work such as bench work in the furniture industry, or as a webber, tacker or joiner." (Tr. 45)

■ In so doing, the administrative law judge failed to meet his burden of proving that claimant could engage in other jobs existing in the national economy. Even if this case would turn out not to be so complex as to require the advice of a vocational expert, the administrative law judge must specify the grounds for his "transferability" decision so that the Court may determine if

---

5. Such discussion, however, would undoubtedly look better and be understood more clearly if made in an itemized manner, when the facts so allow.

it is supported by substantial evidence or not.

■ The following questions exemplify the doubts which the Secretary's blunt determination poses. First; no reference is made to the Dictionary of Occupational Titles or other similar job data compendium, which could certify the existence of the mentioned jobs in the national economy. While a vocational expert may not be required to make such a reference because of his experience and training, the administrative law judge has no such specialized qualifications. Although allowed to take administrative notice of jobs in the national economy, he must do so by reference to the mentioned publications or others of a similar nature, 20 CFR 404.1509(c), unless the jobs which plaintiff has been proven able to perform are commonly known to exist in the national economy. *Hernández v. Weinberger, supra.* The jobs of webber, tacker or joiner are not of the type "commonly known to exist in the national economy".

Second, no description of each job is given which would enable us to determine the skills necessary for their performance. This is indispensable for a determination on review of whether substantial evidence supports a decision that plaintiff can engage in such occupations.

Third, the administrative law judge offers no indication of the specific skills which he deemed transferable so that we may evaluate the match-up of jobs with skills in light of the substantial evidence standard. See *Phillips v. Harris, supra,* at p. 1167.

Fourth, the regulations recognize that in cases where the claimant is of advanced age and closely approaching retirement age (60–64 years of age), the determination of transferability presents a special problem.[6] There is no indication on record of whether said problem was taken into consideration by the administrative law judge or of what weight, if any, did he accord to the age factor in his determination. Neither is there reference to the administrative law judge's own finding that plaintiff should perform work of a routine, repetitive and simple nature in which he would not be placed under intensive tension or pressure. (Tr. 46)

Instead, the administrative law judge chose to make a general finding of "transferable skills" while simply citing the corresponding regulations. Such a finding may not be made in a vacuum. The administrative law judge must discuss the factors which moved him to make it, so that the Court may determine if substantial evidence supports the same, or whether the complexity of the problem justified the use of a vocational expert.

■ To summarize, while the advent of the new regulations has certainly paved the way for more uniform disability decisions, the Secretary must apply such rules with care not to disregard the judicial expressions on the "long standing medical-vocational evaluation policies" which the regulations purport to consolidate and elaborate upon.

■ Here, the Secretary has disregarded the well established rule that he must make full and detailed findings in support of all his conclusions, 42 U.S.C. § 405(b); *Small v. Califano, supra; Baerga v. Richardson,* 500 F.2d 309 (3d Cir., 1974), cert. den., 420 U.S. 931, 95 S.Ct. 1133, 43 L.Ed.2d 403 (1975); and that rule which requires the Secretary, upon a claimant's establishment of a *prima facie* case of disability, to produce affirmative evidence of jobs existing in the national economy which someone of claimant's capacities could perform. *Hernández v. Weinberger, supra.*

■ For the above stated reasons, we find that the instant case should be remanded to the Secretary for clarification on the finding of transferability of skills, consist-

---

**6.** Rule 201.00(f) of Appendix II to Subpart P provides as follows:

"For a finding of transferability of skills to light work for individuals of advanced age who are closely approaching retirement age (60–64), there must be very little, if any, vocational adjustment required in terms of tools, work processes, work settings, or the industry."

ent with our pronouncements hereinabove. The possible use of a vocational expert should be carefully considered by the Secretary, lest we be forced to again remand or reverse the Secretary's decision on account of a failure to recognize a vocational dilemma too complex for the unassisted determination by an administrative law judge. The abundant case law on the matter, part of which is cited herein, should guide the Secretary in making the decision of the use or not of a vocational expert. See, e. g., *Small v. Califano, supra; Hernández v. Weinberger, supra; Phillips v. Harris, supra.*

The instant case is hereby remanded to the Secretary for further proceedings consistent herewith.

SO ORDERED.